Alex R. Straus SBN 321366
astraus@milberg.com
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Telephone: (917) 471-1894
Facsimile: (310) 496-3176

*Counsel for Plaintiff and Proposed Class*
*(additional counsel listed on signature page)*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| DMITRY ZINGER, on behalf of himself and all others similarly situated, | Case No.: |
| Plaintiff, | Hon. |
| v. | **CLASS ACTION COMPLAINT** |
| SINCH AMERICA, INC., INTELIQUENT, INC., ONVOY, LLC, DOE TELEMARKETING COMPANIES 1-100, and JOHN AND JANE DOES 1-100, | **DEMAND FOR JURY TRIAL** |
| Defendants. | 1. **Telephone Consumer Protection Act 47 U.S.C. § 227** *eq seq.* <br> 2. **47 C.F.R. § 64.1200(d)(3)** <br> 3. **47 C.F.R. § 64.1200(d)(6)-(7)** |

## NATURE OF THE ACTION

1.      This action arises under the federal Telephone Consumer Protection Act (TCPA), a remedial statute enacted in 1991 in response to consumer outrage over the proliferation of intrusive, nuisance telemarketing practices. The TCPA and its accompanying regulations prohibit Defendants from making telephone solicitations to persons who have listed their telephone numbers on the national Do Not Call Registry, a database established to allow consumers to exclude themselves from telemarketing calls, which include text messages, unless they consent to receive the calls in a signed, written agreement. The TCPA also prohibits Defendants from making telephone calls to

persons that feature a prerecorded or artificial voice and/or using an "automatic telephone dialing system" (ATDS) without the prior express consent of the party called.

2.      Plaintiff Dmitry Zinger is one of the millions of consumers who have registered their number on the national Do Not Call Registry. Nevertheless, he has received numerous telemarketing calls from Defendants Sinch America, Inc ("Sinch"), Inteliquent, Inc. ("Inteliquent") and Onvoy, LLC ("Onvoy"). Despite Plaintiff sending numerous complaints to Defendants Inteliquent and Onvoy and to the parent company of Defendants Onvoy and Inteliquent – Sinch – about Defendants' incessant calls to him in violation of the TCPA's Do Not Call Provision along with requests to be placed on all three companies' internal do-not-call list, Plaintiff Zinger continues to receive these unwanted calls from Defendants.

3.      Mr. Zinger has been victimized by multiple telemarketing calls made by Defendants, including without limitation robocalls related to car warranties, student loan forgiveness services, as well as calls from entities impersonating the Social Security Administration and United States Marshalls, and many others.

4.      One such telemarketing call featured the following prerecorded message with an artificial voice targeting Mr. Zinger with tax debt elimination "services":

> I am the Virtual Assistant for Margaret Smith with the Central Processing Center for IRS back tax negotiations. The purpose of this call is to make you aware that a recent lawsuit settlement now requires the IRS to settle all old tax debt that any US residents currently have. This means you do not need to pay back your past due taxes as they are temporarily non-collectable and can be forced into a settlement on your behalf. Using our automated approval technology, you are now able to obtain enrollment information based on your current situation. To use our AI automation and find out the program you are approved for, you will need to write down the website. I will also deliver a text message that will provide a link with the program benefits. Would you like to hear the website and receive a text message?

5.      If the recipient says "Yes," they are eventually transferred to a call center where agents sometimes identify themselves as working for "Tax Help" and attempt to gather consumers' personal and confidential financial information.

6.      At the time of these calls, Defendants Onvoy, Inteliquent and Sinch knew they were making or initiating calls on behalf of an array of telemarketers that flagrantly violated the TCPA to sell Mr. Zinger products and "services" he did not want, did not request, and to gather his personal information for fraudulent purposes. However, Defendants' position as stated to Plaintiff was that it is not their responsibility to comply with the TCPA and its accompanying regulations.

7.      Plaintiff brings this action on behalf of the four proposed national classes defined below and seeks statutory damages of $500-$1,500 per illegal call.

## **PARTIES**

8.      Plaintiff Dimitry Zinger is a resident of the State of Wisconsin residing Germantown. At all times herein, Mr. Zinger has been the exclusive and customer user of telephone number 414-XXX-6258.

9.      Defendant Sinch America, Inc. (Sinch) is the parent company for Defendants Onvoy and Inteliquent. It is a part of the international network of Sinch companies based on Sweden. Sinch America, Inc. is a Delaware Corporation with offices around the Country, including its Sinch United States San Francisco location at 600 California Street, San Francisco, California 94108.

10.      Defendant Inteliquent, Inc. is a VoIP provider with its headquarters at 550 West Adams Street, Suite 900, Chicago, IL 60661. Inteliquent merged with Onvoy, LLC under the name Inteliquent.

11.      Defendant Onvoy, LLC is also a VoIP provider with its headquarters at 550 West Adams Street, Suite 1130, Chicago, IL 60601.

12.      Upon information and belief, over 60% of unwanted spam telephone calls are placed by the Onvoy, Inteliquent and Sinch.

13.      Doe Telemarketing Companies 1-100 are unidentified lead generators and call centers that provide contact information for consumers and interact with consumers when Onvoy, Inteliquent and Sinch route a live call recipient to their call center.

CLASS ACTION COMPLAINT

14.     John and Jane Doe Defendants 1-100 are the principals, owners, officers and directors of Doe Telemarketing Companies 1-100. Plaintiff brings this action against them individually for personal liability.

## JURISDICTION AND VENUE

15.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227 *et seq.*

16.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C §§ 1332 and 1367 because this is a class action in which the matter or controversy exceeds $5,000,000 exclusive of interests and costs, and in which some members of the proposed classes are citizens of a state different from Defendants.

17.     This Court has supplemental jurisdiction over Defendants because they transact business in the United States, including in this District, have substantial aggregate contacts within the United States, including in this District, engaged in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed themselves of the laws of the United States and the State of California.

18.     Venue is proper in this District because this District is where a substantial portion of the conduct giving rise to Plaintiff's claims occurred, where Defendants transact business, and Defendant Sinch resides in San Francisco, and the remaining Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction at the time the action is commenced.

## DIVISIONAL ASSIGNMENT

19.     Pursuant to N.D. Cal Civ. L.R. 3-2(c), (d), and 3-5(d), this Action is properly assigned to the San Francisco or Oakland division because a substantial part of the events and omissions which give rise to the claim emanated from one of Defendant Sinch America, Inc.'s

CLASS ACTION COMPLAINT

principal places of business located in San Francisco, and members of the putative Classes are located in San Francisco and Oakland.

## FACTUAL ALLEGATIONS

### A.   THE TCPA DO NOT CALL REGISTRY

20.     In 1991, Congress enacted the TCPA[1] in response to a growing number of consumer complaints regarding certain telemarketing practices.

21.     Consumers who do not want to receive telemarketing calls may indicate their preference by registering their telephone numbers on the national Do Not Call Registry pursuant to 47 C.F.R. § 64.1200(c)(2):

> No person or entity shall initiate any telephone solicitation to … [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. Such do-not-call registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator.

22.     Federal regulations implementing the TCPA provide that "[t]he rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."" 47 C.F.R. § 64.1200(e).

23.     According to the Federal Trade Commission, the Do Not Call Registry, which was established in 2003, has over 244 million active registrants. During the 2021 fiscal year, the FTC received over five million Do Not Call complaints.[2]

---

[1] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), codified at 47 U.S.C. § 227 (TCPA). The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. § 201 *et seq.*

[2] https://www.ftc.gov/reports/national-do-not-call-registry-data-book-fiscal-year-2021 (visited April 7, 2022)

24.     These registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator. 47 C.F.R. § 64.1200(c)(2).

25.     The FCC's regulations implementing the TCPA also require persons or other entities that make telemarketing calls to maintain company-specific do-not-call lists and to honor do-not-call requests. 47 C.F.R. § 64.1200(d). Company-specific do-not-call requests must be honored for five years from the time the request is made. 47 C.F.R. § 64.1200(d)(6). Sellers must coordinate the do-not-call requests received by their telemarketers, so that all telemarketing calls on behalf of the seller cease if a consumer makes a do-not-call request to one of the seller's telemarketers. *United States v. DISH Network, L.L.C.*, 954 F.3d 970, 975-976 (7th Cir. 2020).

26.     The FCC ruling that a cell phone can be a residential line applies to the company-specific do-not-call provision. 47 C.F.R. § 64.1200(e).

## B.     THE TCPA RESTRICTIONS ON CALLS USING AN ARTIFICIAL OR PRERECORDED VOICES AND AUTODIALERS

27.     The TCPA also regulates the use of telephone equipment and prohibit calls that use an ATDS or feature prerecorded messages or artificial voices to any residential or cellular telephone.

28.     Specifically, the plain language of sections 227(b)(1)(A)(iii) and 227(b)(1)(B) prohibit using an artificial or prerecorded voice or autodialers to make any call to a wireless or residential telephone number without the prior express written consent of the called party unless the call is made solely to collect debt owed or guaranteed by the United States or is initiated for emergency purposes.

29.     According to the findings of the FCC, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are costly, inconvenient, and a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.[3]

30.    The FCC confirmed that the TCPA applies to text messages: "We affirm that under the TCPA, it is unlawful to make any call using an automatic telephone dialing system or an artificial or prerecorded message to any wireless telephone number . . . . This encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls, provided the call is made to a telephone number assigned to such service."[4]

31.    The FCC has defined prior express written consent in 47 C.F.R. § 64.1200(f)(8) as "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered."

32.    Under the TCPA, the burden is on the Defendant to demonstrate that Mr. Zinger and members of the Autodialer Class and Prerecorded Message and Artificial Voice Class gave their prior express consent to receive a prerecorded or an autodialed call to their cellular or residential telephones.

---

[3] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, report and Order, 18 FCC Rcd 14014 (2003).
[4] Report & Order, *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, at ¶ 165 (F.C.C. July 3, 2003) (footnotes omitted). The FCC reiterated this conclusion in 2012—*In re* Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C. Rcd. 1830, at ¶ 4 (F.C.C. Feb. 15, 2012)—and in 2015. *See* In re *Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, at ¶¶ 27, 107–108, 111–115 (F.C.C. July 10, 2015), appeal resolved, *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687 (D.C. Cir. 2018) (setting aside two parts of 2015 ruling but leaving this portion undisturbed)

### 1.  Automatic Telephone Dialing Systems

33.  The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[5]  This statutory language dictates that "the term 'automatic telephone dialing system' means equipment which has the capacity—(1) to store numbers to be called *or* (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically (even if the system must be turned on or triggered by a person)."  *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, at 1053 (9th Cir. 2018) (emphasis supplied).[6]

34.  The 2003 FCC order defined a predictive dialer as "an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call."[7] The FCC concluded that "[t]he basic function of such equipment . . . [is] the capacity to dial numbers without human intervention.[8] A 2008 Declaratory Ruling "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."[9] In yet another order issued in 2012, the FCC again reiterated that the TCPA's definition of an ATDS "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers

---

[5] 47 U.S.C. § 227(b)(1)(A)(iii).

[6] In the past, the FCC has held that this definition is satisfied when a dialing system has the capacity to call "a given set of numbers" or when "dialing equipment is paired with . . . a database of numbers."  *2003 FCC Declaratory Ruling*, 18 FCC Rcd. 14,014, ¶ 133; *see also 2008 FCC Declaratory Ruling*, 23 F.C.C. Rcd. at 566 (rejecting argument that a dialing system "meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists" and reasoning that "the teleservices industry had progressed to the point where dialing lists of numbers was far more cost effective").

[7] *2003 FCC Declaratory Ruling*, 18 FCC Rcd. at 14,143 n.31.

[8] *Id*. at 14,092.

[9] *FCC Declaratory Ruling*, 23 FCC Rcd. 559.

called are randomly or sequentially generated or come from calling lists."[10] In 2018, a decision

struck down portions of the FCC Order, but "the prior FCC Orders are still binding."[11]

35. Courts have also held that, based on the TCPA's statutory language, a predictive

dialing system constitutes an ATDS under the TCPA. *See, e.g., Marks*, 904 F.3d at 1051

("Although Congress focused on regulating the use of equipment that dialed blocks of sequential or

randomly generated numbers—a common technology at that time—*language in the statute*

*indicates that equipment that made automatic calls from lists of recipients was also covered by the*

*TCPA*.") (emphasis added).

36. The FCC's 2003 Declaratory Ruling confirmed that the TCPA's definition of a

"call," for purposes of the limitations on the use of an autodialer, "encompasses both voice calls and

text calls to wireless numbers including, for example, short message service (SMS) calls."[12]

## C. FEDERAL COMMUNICATION REGULATIONS GOVERNING ABANDONED CALLS

37. One of the problems with Sinch, Inteliquent and Onvoy using an ATDS to call

consumers is that it leads to a lot of abandoned calls. Indeed, the called party may answer the call

but the call center where these Defendants transfer consumers may be at capacity and nobody can

speak to the consumer. Consumers complain about having the rush to answer the phone only to find

nobody at the other end of the call.

38. The FCC Regulations accompanying the TCPA restrict call abandonment in two

ways. First, FCC regulations require that the caller not disconnect an unanswered telemarketing call

prior to at least fifteen seconds or four rings.[13] The rule is meant to prevent Defendants like Sinch

---

[10] *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 15,391, 15,399 (2012).
[11] *Reyes v. BCA Fin. Servs., Inc.*, Case No. 16-24077-CIV, 2018 WL 2220417, at *11 (S.D. Fla. May 14, 2018).
[12] *FCC Declaratory Ruling*, 18 FCC Rcd. at 14,115.
[13] 47 C.F.R. § 64.1200(a)(6).

CLASS ACTION COMPLAINT

from disconnecting before the recipient has time to reach the phone. Second, if the called party answers the call, FCC regulations restrict call abandonment.[14]

39.     A call is considered abandoned if it is not connected to a live sales representative within two seconds of the called person's greeting.[15]

40.     The FCC regulations allow regulated persons to abandon up to three percent of their calls in a single calling campaign, as measured over a thirty-day period, and compliance records must be maintained.[16]

41.     Defendants must keep compliance records of their call abandonment rates.

## D. TECHNOLOGY USED IN ROBOCALLING SCHEMES AND THE BUSINESS PRACTICES, CUSTOMER SERVICE AND MARKETING OF SINCH, INTELIQUENT AND ONVOY PRODUCTS AND SERVICES

### 1.  The Technology

42.     Defendants Onvoy, Inteliquent and Sinch are communication and network providers that provide their customers – in this case DOE Telemarketing Companies 1-100 and John and Jane Does 1-100 – with a full suite of VoIP software and network connectivity to operate their telemarketing "businesses."

43.     Upon information and belief, the Sinch and Inteliquent network and suite of products offered are the nearly identical. Inteliquent used to operate under the Onvoy brand until the companies merged and Onvoy began operations under the Inteliquent name.

44.     Sinch represents on its website, "Relax and lay back – you're in good hands!" Sinch touts its "Supernetwork" on its website claiming "Sinch has the largest global tier 1 network with 600+ direct operator connections and an unmatched range of OTT channels." Sinch claims it has "True global reach" because it can "[r]each any mobile phone on the planet – in seconds, or less.

---

[14] 47 C.F.R. § 64.1200(a)(7).
[15] *Id.*
[16] 47 C.F.R. § 64.1200(a)(7)(iii).

With Sinch, you get 100% consumer penetration on any mobile channel." Sinch also claims it is a **"One-stop shop"** offering "CPaas, SMS, Voice, Video, Verification, SMS, rich messaging, SaaS and more … we're here for all your mobile messaging needs." (emphasis added). Finally, Sinch claims to offer "World-class support" and advertises its customer service claiming "[w]e don't want to sell you a product. We want to help you succeed. Enterprises love our superior customer service!"[17] Sinch advertises on its website that "You can depend on us," that it has 115,000,000 phone numbers powered by its network with 300,000,000,000 minutes of use on its network annually, and that it has 37% more local number coverage than other providers.

45.    Like Sinch, Inteliquent advertises on its website that "You can depend on us," that it has 115,000,000 phone numbers powered by its network with 300,000,000,000 minutes of use on its network annually, and that it has 37% more local number coverage than other providers.[18] Intiliquent provides telecommunications services in the following states: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming.

46.    They offer multiple direct messaging communication services, an array of voice and video services, including creating messages with artificial intelligence voices for their customers. For example, Sinch advertises that:

> The first-ever 2022 Gartner® Magic Quadrant™ for Enterprise Conversational AI Platforms was just released, and we're proud to say Sinch is included. 'With CPaaS, we make it possible to reach people anywhere, on virtually any channel,' said Oscar Werner, CEO of

---

[17] https://www.sinch.com (visited April 7, 2022)
[18] https://www.inteliquent.com/about-us (visited April 7, 2022).

Sinch. With applications like Chatlayer, we make it easy – with no tech resources needed – for them to automate their customer communications using AI chatbots and voicebots."[19]

47.     The technical ability to place robocalls at issue in this litigation is dependent on (1) voice-over-interest-protocol (VoIP) and related technology to create the calls, and (2) a "gateway carrier" to introduce the (often foreign) phone traffic into the U.S. phone system. The term "gateway carrier" refers to a U.S.-based person or entity that agrees to accept VoIP traffic (often from a foreign source) and either pass the traffic to a downstream VoIP carrier or deliver the call directly to the consumers' phone thereby routing the calls to their final destination in the United States. VoIP uses broadband internet connection – as opposed to an analog copper phone line – to place calls locally, long distance, and internationally, without regard to whether the call recipient uses a cellular phone or a traditional, wired phone. The technology employed by modern telecommunication providers mediates between digital VoIP signals and regular telephone signals so that communication is seamless between VoIP users and non-VoIP users at either end. VoIP is used in telemarketing schemes both to make the initial robocall to U.S. phones and to communicate with individuals who either answer the robocall or call the number contained in the recorded message.

48.     VoIP relies upon a set of rules for electronic communication called Session Initiation Protocol (SIP). Much like the way browsing websites on the internet uses HyperText Transfer Protocol (HTTP) to initiate and conduct information exchanges between devices through exchanges of packets of information, SIP is a set of rules used to initiate and terminate live sessions for things such as voice and video communication between two or more points connected to the internet. Both SIP voice communication and HTTP web-browsing rely on exchanging data packets between two points. For example, web browsing via HTTP requires an individual to request information from

---

[19] https://www.sinch.com/blog/cpaas-conversational-ai-what-makes-sinch-stand-out/ (visited April 8, 2022).

another point on the internet, usually by clicking on a hyperlink or entering a web address in the browsers' address bar, usually preceded by http://www, which tells the device that it is making a request for information on the World Wide Web via HTTP. A device receiving that request will send back information to the requesting device, and thus, the requesting device will display the requested website.

49.     Similarly, a voice call via SIP starts as a data packet sent to initiate a call, a responsive packet sent back that indicates whether the call has been answered, and numerous other packets transiting back and forth; amongst these data packets is information that machines turn into audible signals, i.e., a conversation that can be heard by the participants. In the case of robocalls, a recorded message is transmitted once the call is answered by voicemail picking up or a live person answering.

50.     Robocalls should not be understood as traditional phone calls. Rather, they are requests for information and responsive data packets transiting the internet via SIP. An outgoing robocall begins as a request for information sent by an automatic telephone dialing system known as an "autodialer" that – in conjunction with VoIP services – enables the caller to make millions of sequential requests for information (i.e., outbound VoIP phone calls) in a very short time. A VoIP autodialer is a specialized type of telecommunications equipment with the capacity to (1) store or produce telephone numbers to be called, and (2) request responsive information from devices at the other end of the call, i.e., dial telephone numbers. The autodialer's requests for information are directed to devices (here, telephones) that send back responsive information when the call is answered either by a live person or the person's voicemail. When the autodialer receives information from the called device indicating that the call is answered, the autodialer will then send information back to that device (the phone) in the form of a recorded message.

51.     Upon information and belief, Defendants Sinch, Inteliquent and Onvoy create these recordings with artificial voices (or "bot" voices).

52.     These robocalls made by Defendants can not only send prerecorded messages to the individual's phone, but can misrepresent who is calling on the caller ID. Normally, a recipient's caller ID will display information identifying the caller by means of a telephone number; however, many VoIP software packages allow the caller to specify the information appearing on the call recipient's caller ID, much in the same way an email's subject line can be edited to state whatever the sender wishes. This practice of specifying what appears on the recipient's caller ID is called "spoofing." This feature of VoIP technology permits a caller with an illicit motive to spoof a legitimate phone number, such as that belonging to a government entity, in order to cloak the fraudster with indicia of authority and induce the recipients to answer the call. Spoofing also encourages potential victims to return calls when they look up the spoofed number and see that it is a number used by an official government entity. In the robocall schemes described throughout this Complaint, spoofing serves the purpose of deceiving the potential victim about who is calling them.

53.     Spoofing any phone number is a simple matter of editing a SIP file to state the desired representation on the caller ID. These files can then be loaded by Defendants into an autodialer to become robocalls, replicated millions of times with the spoofed, fraudulent caller ID information.

54.     The fraudulent robocalls generally leave prerecorded messages containing misinformation. Some of these messages direct the recipient to press a key to speak with a live operator. Other fraudulent messages leave a domestic telephone number as a "call-back" number. In either case, the recipient is connected to a fraudster at an (often foreign) call center.

55.     A gateway carrier is an essential element of illegal telemarketing practices perpetrated through these robocall schemes. Foreign call centers and VoIP providers cannot connect VoIP phone traffic directly to the U.S. telephone system from a foreign location without the assistance of a U.S.-based telecommunication provider willing to accept the foreign traffic. For example, a fraudulent call center in India cannot directly upload tens of millions of robocalls to the

- 14 -

U.S. telephone system, even where they have broadband internet and VoIP service. Foreign VoIP telephone traffic cannot enter the U.S. telephone system without traveling through a gateway carrier willing to accept the foreign traffic and introduce it into the U.S. telephone system.

**2. Defendants' Business Practices Demonstrate They Are Directly Liable for Making the Calls at Issue**

56.     Sinch, Inteliquent and Onvoy serve as carriers for calls originating abroad and that are bound for the United States. Sinch states on its website that it provides voice termination, which means it carriers calls from overseas and passes them into the U.S. telephone system and will pass calls from the United States to overseas destinations. With respect to many of the robocalls described throughout this Complaint for which Defendants provides termination services, it is a gateway carrier. In the context of these telemarketing schemes, U.S.-bound robocalls are "U.S. terminat[ed]" calls and return calls to telemarketing fraudsters in other countries are "international voice terminat[ed] calls.

57.     Sinch, Inteliquent and Onvoy also provide the telephone numbers used to make these calls, the network through which these calls are placed, the hardware and software needed to make the calls, and the automated equipment needed to make massive amounts of robocalls. These three Defendants are the ones that make or initiate the actual call to consumers using their VoIP technology. Telemarketer in foreign call centers merely wait for Sinch, Inteliquent and Onvoy to route a live caller to the call center if the recipient does not hang up immediately or ignores the call.

58.     Along with the basic functions of a VoIP carrier, Defendants Sinch, Onvoy and Inteliquent do a lot more. Rather than just provide VoIP access, these Defendants actually create the content for the telemarketing campaigns they allow to run through their network. For example, one service Sinch provides is artificial voice services to its clients. On its website, Sinch admits it provides templates for these artificial voice bots and states in response to a FAQ asking, "How do I build a good bot?" Sinch's answer: We've got a lot of experience with bot design and are happy to

share the wealth. When you log in to the platform, you'll find best-practice templates to guide you. You can use these or adapt them as you live – no additional cost."[20] The artificial voice message in paragraph 4 appears to be such a template.

59.    It also advertises programable Voice API "that reaches customers on any platform or channel . . . Enjoy a high-quality voice experience, optimized delivery routes, and a carrier super network – all in one place." Sinch also advertises on its website "call recording", creating pre-recorded messages for "customized online phone conversations," "text-to-speech," "number masking" (which prevents Caller ID from identifying the caller), and a "local presence" by assigning numbers to its customers that have the same area codes as the people their customers are trying to reach.[21] Sinch also advertises its text messaging services on its website.

60.    Upon information and belief, Sinch controls the voice message template used as the template for the robocall, creates the artificial voice on the robocall, places the robocall to a recipient's cell phone using its VoIP network, is fully aware that its customers are using its platform to engage in activity that violates the TCPA and many other laws.

61.    Sinch, Inteliquent and Onvoy also control which telephone users receive the prerecorded message with an artificial voice and when the call is placed through its autodialers. This is apparent because they do not target a specific audience with their robocalls – they call everyone. For example, these Defendants will send an illegal robocall to Plaintiff related to a Medicare scam designed to trick senior citizens into turning over their money to fraudster. Yet Mr. Zinger is not on Medicare. He also has received student loan scam forgiveness "services" calls from Defendants, but Mr. Zinger doesn't have any student loans. It is obvious that Sinch, Inteliquent and Onvoy upload as many telephone numbers to their autodialers as possible to call anyone and everyone to get leads for their clients' call centers.

---

[20] https://www.sinch.com/products/chatlayer/ (visited April 10, 2022)
[21] https://www.sinch.com/products/apis/voice-calling/ (visited April 10, 2022)

62.     Over a period of years, Defendants received many notices, inquiries, warnings, complaints concerning fraudulent robocalls and other suspicious activity occurring on their systems. These warnings and inquiries came from other telecommunication providers, an industry trade group, and government agencies. Nevertheless, Defendants Sinch, Inteliquent and Onvoy continue enable these telemarketing schemes by placing calls for other telemarketers using their VoIP technology.

63.     Defendant Sinch does not appear to take these warnings and complaints seriously. As CEO Oscar Werner responded to an email from Mr. Zinger complaining about unlawful robocalls and stated on December 1, 2021, "Another one of these."

64.     Some of the numbers that Defendants used to call Mr. Zinger are now assigned to different telephone carriers. Rather than shutting down the illegal telemarketing practices on its network that it essentially created, Defendants merely sell the numbers to new companies that have no idea these numbers are used by fraudsters in foreign call centers to steal from American consumers, spreading their own toxicity throughout the entire US telephone system.

## E.     IN THE ALTERNATIVE TO DIRECT LIABILITY, DEFENDANTS SINCH, INTELIQUENT AND PNVOY ARE THE AGENTS of DOE TELEMARKETING COMPANIES 1-100 and JOHN AND JANE DOES 1-100.

65.     In the alternative to the theory of direct liability against Sinch, Onvoy and Inteliquent for the TCPA violations alleged herein, these Defendants are the agents of DOE Telemarketing Companies 1-100 and John and Jane Does 1-100.

66.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations. *See* FCC Declaratory Ruling, Memorandum and Order, 10 FCC Rcd. 12391, 12397 (¶ 13) (1995).

67.     On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under

federal common law principles of agency for violations of … section 227(b) … that are committed by third-party telemarketers."[22]

68.     More specifically, the May 2013 FCC Ruling held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer has apparent (if not actual) authority" to make the calls. 28 F.C.C.R. at 6586 (¶ 34).

69.     The FCC has rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of a formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at n. 107.

70.     The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> {A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to the information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability of the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mar may also be relevant. It may also be persuasive that the seller approved, wrote, or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for unauthorized conduct of a third-party telemarketer that is authorized to market on the seller's behalf if the seller knew (or reasonably should have

---

[22] In the Matter of The Joint Petition Filed by DISH Network, LLC, the United States of America, and the States of California, Illinois, North Carolina and Ohio for Declaratory Ruling concerning the Telephone Consumer Protection Act (TCPA) Rules, et al., CG Docket No. 11-50, 28 F.C.C.R. 6574, 6574 (¶ 1) (May 9, 2013) ("May 2013 FCC Ruling").

known) that the telemarketer was violating the TCPA on the seller's behalf and the

seller failed to take effective steps within its power to force the telemarketer to

cease that conduct.

28 F.C.C.R. at 6592 (¶ 46).

**Actual Authority**

71.     DOE Telemarketing Companies 1-100 and John and Jane Does 1-100 have or had an

agency relationship with Sinch, Inteliquent, and Onvoy.

72.     DOE Telemarketing Companies 1-100 and John and Jane Does 1-100 provided

Sinch, Inteliquent and Onvoy actual authority to make the calls described throughout this complaint

using the telephone numbers supplied by Sinch, Inteliquent and Onvoy.

73.     DOE Telemarketing Companies 1-100 and John and Jane Does 1-100 provided

content to Sinch, Inteliquent and Onvoy to use to complete the prerecorded voice message templates

offered by Sinch, Inteliquent and Onvoy.

74.     Sinch, Inteliquent and Onvoy agreed to use the content provided by DOE

Telemarketing Companies 1-100 and John and Jane Does 1-100 in making the calls described

throughout this Complaint and did use this content in making the calls described throughout this

Complaint.

75.     DOE Telemarketing Companies 1-100 and John and Jane Does 1-100 provided

Sinch, Inteliquent and Onvoy actual authority to route live callers to the call centers owned and/or

operated by DOE Telemarketing Companies 1-100 and John and Jane Does 1-100.

76.     Sinch, Inteliquent and Onvoy did route these live callers to the call centers owned

and/or operated by DOE Telemarketing Companies 1-100 and John and Jane Does 1-100.

77.     Despite Sinch, Inteliquent and Onvoy receiving a constant stream of complaints from

consumers about unwanted calls, these Defendants continued to make the telemarketing calls as the

agents of DOE Telemarketing Companies 1-100 and John and Jane Does 1-100 even though they

knew (and continue to know) that DOE Telemarketing Companies 1-100 and John and Jane Does 1-100 were (and are still) engaged in unlawful activity. DOE Telemarketing Companies 1-100 and John and Jane Does 1-100 also know that Sinch, Inteliquent and Onvoy are engaged in unlawful activity in making these calls on their behalf.

78.     In order for DOE Telemarketing Companies 1-100 and John and Jane Does 1-100 to ensure there telemarketing campaigns are targeting live cellular and residential telephone where callers answer (rather than dead lines or fax machine lines), upon information and belief, these Defendants specifically direct Sinch, Inteliquent and Onvoy to place brief calls and immediately disconnect after (i) determining the phone called works and (ii) is answered by a live human being.

79.     Moreover, Sinch, Inteliquent and Onvoy did in fact place brief calls and immediately disconnected the call after (i) determining the phone called works and/or (ii) is answered by a live human being, as they were directed to by their principals, DOE Telemarketing Companies 1-100 and John and Jane Does 1-100.

80.     DOE Telemarketing Companies 1-100 and John and Jane Does 1-100 also authorized Sinch, Inteliquent and Onvoy to conceal the number used to initiate the call in order to conceal the identities of DOE Telemarketing Companies 1-100 and John and Jane Does 1-100.

81.     Sinch, Inteliquent and Onvoy did in fact use caller ID spoofing technology to hide the number used to call Plaintiff and Class members.

## F.     PLAINTIFF DMITRY ZINGER'S FACTUAL ALLEGATIONS

82.     Plaintiff Dmitry Zinger (Mr. Zinger) is a citizen of the State of Wisconsin and at all times herein has been the exclusive and customer user of the telephone number 414-XXX-6258, which was assigned to a cellular telephone service.

83.     Mr. Zinger's telephone number has been registered with the National Do Not Call Registry as of June 5, 2006.

84.     Mr. Zinger received the following calls from Onvoy, Inteliquent and Sinch featuring widespread telemarketing schemes even though his phone number is registered is on the national Do-Not-Call Registry and he reported each call to Onvoy, Inteliquent and/or Sinch. Below are just some examples of the calls Mr. Zinger has received from Defendants Onvoy:

a.  March 10, 2022 at 9:08 a.m. CST: Mr. Zinger received a robocall from (414) 279-7618;

b.  February 4, 2022 at 7:09 a.m. CST: Mr. Zinger received a robocall from (262) 266-1753;

c.  February 3, 2022 at 12:49 p.m. CST: Mr. Zinger received a robocall from (505) 397-5859 trying to sell him a car warranty;

d.  January 11, 2022 at 10:39 a.m. CST: Mr. Zinger received a robocall from (346) 273-0292 trying to sell him a car warranty;

e.  January 10, 2022 at 12:38 p.m. CST: Mr. Zinger received a robocall from (414) 751-0573, which he identified as a number that was re-sold by Defendants to another carrier. The call center agents sounded like they lived in a foreign country;

f.  December 30, 2021 at 9:28 a.m. CST: Mr. Zinger received a robocall from (414) 240-9937 from telemarketers purportedly trying to buy his home with cash;

g.  December 13, 2021 at 9:00 a.m. CST: Mr. Zinger received a robocall from (262) 582-2073.

h.  Decembre 9, 2021 at 9:34 a.m. CST: Mr. Zinger received a robocall from (608) 384-5561;

i.  December 1, 2021 at 10:24 a.m. CST: Mr. Zinger received a robocall from (534) 202-4799 that sounded like a call center in a foreign country offering to selling him advisory services for Medicare (even though Mr. Zinger is not on Medicare);

CLASS ACTION COMPLAINT

j.  November 23, 2021 at 4:41 p.m. CST: Mr. Zinger received a robocall from (414) 206-6411 related to medical services;

k.  November 23, 2021 at 4:41 p.m. CST: Mr. Zinger received a robocall from (414) 206-6411 related to medical services;

l.  November 23, 2021 at 10:06 a.m. CST: Mr. Zinger received a robocall from (703) 468-0947 related to what sounded like a phishing attempt;

m.  November 23, 2021 at 9:53 a.m.. CST: Mr. Zinger received a robocall from (414) 206-6411 related to medical services;

n.  November 4, 2021 at 5:10 p.m. CST: Mr. Zinger received a robocall from (703) 988-7611 purportedly soliciting him for a job offer;

o.  November 1, 2021 at 11:22 a.m. CST: Mr. Zinger received a call from (414) 279-6384 related purporting to offer to purchase his property.

p.  November 1, 2021 at 11:55 a.m. CST: Mr. Zinger received two calls from (253) 366-7843 offering to sell him prescription drugs purportedly from a Canadian pharmacy.

q.  September 22, 2021 at 1:46 p.m. CST: Mr. Zinger received a call from (262) 266-1904 purportedly offering Mr. Zinger "free medical testing" in the middle of the COVID-19 pandemic. Mr. Zinger had received at least two prior calls from the same number.

r.  September 1, 2021 at 3:04 p.m. CST: Mr. Zinger received a call from (414) 404-0899 offering certain promotional items.

s.  September 1, 2021 at 2:48 p.m. CST: Mr. Zinger received a call from (262) 266-1874 offering certain promotional items.

t.  August 10, 2021 at 3:15 p.m. CST: Mr. Zinger received a call from (209)-792-0563 advertising services from the "National Enrollment Center."

u.  August 6, 2021 at 12:01 p.m. CST: Mr. Zinger received a call from Defendants "bot" from (251) 336-3007 impersonating Amazon.

v.  Mr. Zinger received the following calls purporting to offer "Medicare advisory services" on the following dates and times from the following numbers from Defendants:

   i.  August 25, 2021 at  10:50 a.m. CST from (208) 844-6347

   ii.  August 23, 2021 at 9:31 a.m. and 9:32 a.m. CST from (870) 464-2132;

   iii.  August 20, 2021 at 2:34 p.m. CST and 2:35 p.m. CST from (870) 464-2132;

   iv.  August 19, 2021 at 4:45 p.m. CST from (870) 464-2132;

   v.  August 10, 2021 at 12:19 p.m. CST from (262) 342-2858;

   vi.  April 9, 2021 at 4:32 p.m. CST from (414) 296-1663;

   vii.  April 8, 2021 at 3:40 p.m. CST from (414) 812-0010;

   viii.  July 29, 2021 at 1:10 p.m. CST from (251) 346-8521

   ix.  July 28, 2021 at 10:29 a.m. CST from (414) 895-7611; 10:54 a.m. and 2:28 p.m. CST from (414) 677-6327; and

   x.  July 21, 2021 at 10:54 a.m. and 2:28 p.m. CST from (414) 677-6327;

85.    The above calls are just a small sample of the telemarketing calls Mr. Zinger has received from the Defendants Onvoy, Inteliquent and Sinch within a twelve-month period.

86.    Mr. Zinger has also received text messages from Onvoy, Inteliquent and Sinch despite repeated requests that these companies not initiate calls or communications to his telephone. The most recent text message was sent by Onvoy, Inteliquent and Sinch on March 25, 2022 at 1:57 a.m. CST from (218) 274-3786 informing him he was pre-approved for a loan of up to $5,000 with any credit type and provided a link to an online application.

87.     Mr. Zinger has also received multiple calls within the last 12 months from Onvoy, Inteliquent and Sinch where the phone rings once and stops, or where he picks up the phone and there is no live agent to speak with and only silence.

88.     Mr. Zinger never consented to receiving telemarketing calls with prerecorded messages or artificial voices, nor did he consent to receiving calls from Defendants after registering his telephone number with the national Do-Not-Call registry.

89.     Mr. Zinger has sent countless requests to Onvoy, Inteliquent, and Sinch requesting Defendants stop calling his telephone and block his number from receiving calls from these Defendants.

90.     Despite multiple requests, Mr. Zinger continues to receive calls from Onvoy, Inteliquent and Sinch.

**E.     JOINT VENTURE**

91.     Mr. Zinger is informed and believes, and on that basis alleges, that at all times herein mentioned, Defendants Onvoy, Inteliquent and Sinch were the joint venturers of Defendants Doe Telemarketing Companies 1-100 and John and Jane Does 1-100, and at all times herein were acting within the course and scope of such joint venture in making these calls to Mr. Zinger, and each Defendant has ratified, approved, and authorized the acts of each of the remaining Defendants with full knowledge of said facts.

92.     Mr. Zinger is informed and believes, and on that basis alleges, that Defendants Onvoy, Inteliquent and Sinch, on the one hand, and Defendants Doe Telemarketing Companies 1-100 and John and Jane Does 1-100, on the other hand, at all times herein mentioned were joint venturers of each other, and were at all time acting within the course and scope of such joint venture, and that Defendants Onvoy, Inteliquent and Sinch ratified, approved, and authorized the acts of Defendants Doe Telemarketing Companies 1-100 and John and Jane Does 1-100 with full knowledge of said facts.

**F.     AIDING AND ABETTING/CONSPIRACY**

93.     Defendants Onvoy, Inteliquent and Sinch, and each of them, aided and abetted, encouraged, rendered substantial assistance to Defendants Doe Telemarketing Companies 1-100 and John and Jane Does 1-100 in breaching their obligations to Mr. Zinger, as alleged herein. In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and the other wrongdoing complained of, each of the Defendants acted with an awareness of its/his/her primary wrongdoing and realized that its/his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing of the other Defendants. Defendants, and each of them, also knowingly conspired to make unlawful telemarketing calls to Mr. Zinger despite knowing that he was on the national Do-Not-Call list or that the calls otherwise violated the TCPA because they featured a prerecorded message and/or artificial voice made using an ATDS.

**G.     ALTER EGO**

94.     There is a unity of interests between Sinch, Onvoy and Inteliquent and each act as the alter ego of the others.

## CLASS ACTION ALLEGATIONS

95.     Mr. Zinger incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

96.     Mr. Zinger brings this action individually and on behalf of all other persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

97.     Mr. Zinger proposes the following four National Classes, subject to amendment as appropriate:

> **National Do-Not-Call Class:** All persons throughout the United States whose telephone numbers were listed on the national Do-Not-Call Registry, and to whom, at any time within the applicable limitations period, more than one call within any twelve-month period

was placed by Onvoy, Inteligent and/or Sinch to offer or promote the sale of various goods and services.

**Company-Specific Do-Not-Call Class**: All persons throughout the United States whose requested their telephone numbers be listed on Defendants' Onvoy, Inteligent and Sinch's company-specific do-not-call list(s), and to whom, at any time within the applicable limitations period, more than one call within any twelve-month period was placed by Onvoy, Inteligent and/or Sinch to offer or promote the sale of various goods and services.

**ATDS and Prerecorded and/or Artificial Voice Robocall Class:**
All persons who in the United States who received a telemarketing call from Onvoy, Inteligent and/or Sinch at any time within the applicable limitations period that featured an artificial voice or prerecorded message and/or was made using an automatic telephone dialing system, including all persons received a telemarketing text message from an Onvoy, Inteligent and/or Sinch did not provide prior express consent to receiving such a text message.

**Abandoned Call Class**
All persons throughout the United States to whom, at any time within the applicable limitations period, received more than one call within any twelve-month period from Onvoy, Inteligent and/or Sinch that was not answered and ranged less than 15 seconds or four rings, or was not connected to a live sales representative within 2 seconds of answering the call.

98.    This action may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

99.    All members of the four classes, respectively, have been subject to and affected by the same conduct, namely (i) receiving telemarketing calls from Defendants after registering their telephone number with the National Do-Not-Call Registry, (ii) receiving telemarketing calls from Defendants after requesting their telephone numbers be placed on the company-specific do-not-call lists of Defendants Onvoy, Inteligent and Sinch; and/or (iii) receiving telemarketing calls from Defendants Onvoy, Inteligent and Sinch featuring prerecorded messages and/or artificial voices; and (iv) receiving calls from Defendants Sinch, Onvoy and Inteligent that are disconnected before the consumer has time to answer the phone.

100.    Mr. Zinger is a member of all four nationwide Classes.

101.    Excluded from the four Classes are Defendants, any entity in which Defendants have a controlling interest, Defendants' agents and employees, any Judge to whom this action is assigned and any member of the Judge's staff and immediate family, as well as Plaintiff's and Defendants' attorneys and members of these attorneys' law firms and their immediate family members.

102.    Mr. Zinger is informed and believes, and on that basis alleges, that each of the four National Classes are comprised of thousands of United States residents that received telemarketing calls from Onvoy, Inteliquent, and Sinch. The precise number of members of the four National Classes are easily ascertainable from the business records of Onvoy, Inteliquent, and Sinch.

103.    Questions of law and fact common to the four nationwide Classes exist and predominate over questions affecting only individual Class members; and resolving these issues for one class member will resolve them for others. These common legal and factual issues include without limitation:

    a.  Whether members of the National Do-Not-Call Class registered their phone numbers with the national Do-Not-Call registry;

    b.  Whether members of the National Do-Not-Call Class received more than one telemarketing call from Defendants within a twelve-month period after registering their telephone numbers with the national Do-Not-Call registry;

    c.  Whether members of the National Do-Not-Call Class requested that their numbers be removed from the national Do-Not-Call registry prior to receiving more than one telemarketing call within a twelve-month period from Defendants;

    d.  Whether members of the Company-Specific Do Not Call Class requested Defendants' Onvoy, Inteliquent and/or Sinch place their numbers on Defendants' company-specific do-not-call lists;

    e.  Whether members of the Company-Specific Do Not Call Class received more than one telemarketing call within a twelve-month period from Defendants Onvoy,

Inteliquent and/or Sinch after requesting to be placed on the Defendants' company-specific do-not-call lists;

f.   Whether members of the Company-Specific Do-Not-Call Class requested that their numbers be removed from Defendants' company-specific do-not-call lists prior to receiving more than one telemarketing call within a twelve-month period from Defendants Onvoy., Inteliquent and/or Sinch;

g.   Whether members of the ATDS and Prerecorded or Artificial Voice Robocall Class received telemarketing calls from Defendants Onvoy, Inteliquent and/or Sinch featuring prerecorded messages and/or artificial voices;

h.   Whether members of the ATDS and Prerecorded or Artificial Voice Robocall Class received telemarketing calls (including text messages) from Defendants Onvoy, Inteliquent and/or Sinch made using an autodialer;

i.   Whether members of all four classes provided prior express consent to receiving telemarketing calls from Defendants;

j.   Whether Defendants Sinch, Onvoy and Inteliquent disconnected unanswered telemarketing calls prior to at least 15 second or four (4) rings;

k.   Whether Defendants Sinch, Onvoy and Inteliquent used any technology to dial a telephone number for the purpose of determining whether the line is a fax or voice line;

l.   The nature and extent of the legal relationship between DOE Telemarketing Companies 1-100 and John and Jane Does 1-100 and Sinch, Inteliquent and Onvoy;

m.   The nature and extent of the products and services Defendants Onvoy, Inteliquent and Sinch provide the other Defendants;

n.   Whether DOE Telemarketing Companies 1-100 and John and Jane Does 1-100 were (and are still)

CLASS ACTION COMPLAINT

o.  Whether Defendants Sinch, Inteliquent and Onvoy sold or otherwise transferred telephone numbers that they knew were being used for illegal and/or fraudulent purposes to other VoIP carriers without the other VoIP carriers knowing about the fraudulent or illegal activity related to the telephone number;

p.  Whether Defendants are liable for statutory damages;

q.  Whether Defendants willfully violated the TCPA;

r.  Whether Defendants are liable for treble damages;

s.  Whether Defendants should be enjoined from engaging in such conduct in the future;

t.  Whether Doe Telemarketing Companies 1-100 are liable for Defendants' TCPA violations; and

u.  Whether John and Jane Doe Defendants 1-100 are personally liable for Defendants' TCPA violations.

104.   Mr. Zinger's claims are typical of the claims of the National Do-Not-Call Class because the claims arise from receipt of more than one telemarketing call in a twelve-month period from Defendants after Mr. Zinger and members of the National Do-Not-Call Class registered their number with the national Do-Not-Call registry but before they (or the database administrator) removed their number from the registry. Each member of the National Do-Not-Call class is entitled to statutory damages.

105.   Mr. Zinger's claims are typical of the claims of the Company-Specific Do-Not-Call Class because the claims arise from receipt of more than one telemarketing calls from Defendants after Mr. Zinger and members of the Company-Specific Do-Not-Call Class requested that Onvoy, Inteliquent and/or Sinch stop making telemarketing calls to their telephone numbers. Each member of the Company-Specific Do-Not-Call class is entitled to statutory damages.

106.   Mr. Zinger's claims are typical of the ATDS and Prerecorded or Artificial Voice Call Class because each member received a telemarketing call from Defendants featuring a prerecorded

message and/or artificial voice made by to their cellular or residential telephones, or received a call

made by an autodialer without prior express consent from the recipient of the call.

107.    Mr. Zinger's claims are typical of the Abandoned Call Class because he has received

more than one call within any twelve-month period from Onvoy, Inteliquent and/or Sinch that was

not answered and lasted less than 15 seconds or four rings.

108.    Mr. Zinger is an adequate representative of all four classes because (i) his interests

do not conflict with the interests of the individual members of the three classes; (ii) Mr. Zinger has

retained counsel competent and experienced in complex class action litigation, particularly

consumer protection litigation; and (iii) Mr. Zinger intends to prosecute this action vigorously. The

interests of members of all three classes will be fairly and adequately protected by Mr. Zinger and

his counsel.

109.    A class action is superior to other available means for the fair and efficient

adjudication of the claims of Mr. Zinger and all four classes. Furthermore, because the economic

damages suffered by the individual class members may be relatively modest, albeit significant,

compared to the expense and burden of individual litigation, it would be impracticable for members

of the three classes to seek redress individually for the wrongful conduct alleged herein. There will

be no undue difficulty in maintaining the management of this litigation as a class action. Mr. Zinger

and members of all four classes' common claims can be economically adjudicated only in a class

action proceeding, thus promoting judicial efficiency, and avoiding multiple trials and inconsistent

judgments.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Statutory Violations of the Telephone Consumer Protection Act, 42 U.S.C § 227(c) Telemarketing in Violation of the TCPA's Do-Not-Call Provisions (On Behalf of the National Do Not-Call Class against Defendants Sinch, Onvoy and Inteliquent)

110.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

111.   In violation of 47 U.S.C. § 227(c), Defendants Onvoy, Inteliquent and Sinch made calls to Plaintiff and the National Do Not Call class members purporting to promote the sale of various goods and services on Plaintiff's and Class members' residential or cellular telephone lines listed on the national Do-Not-Call registry.

112.   Plaintiff and members of the National Do-Not-Call Class received more than one such call in a twelve-month period.

113.   Plaintiff and members of the National Do-Not-Call Class were damaged as a result of receiving these calls in the form of used cell phone minutes, drained phone batteries, invasions of privacy, and emotional distress including anxiety and mental anguish.

114.   Defendants are liable for those violations either directly and through the principles of ratification, as joint venturers or by knowingly engaging in a conspiracy to make calls to Mr. Zinger and members of the National Do-Not-Call Class in violation of the TCPA.

115.   Pursuant to 47 U.S.C. 227(c)(5), Plaintiff Zinger and members of the National Do-Not-Call Class are entitled to an award of up to $500 in statutory damages for each call made by Defendants.

116.   Plaintiff and Class members are also entitled to and do seek injunctive relief prohibiting Onvoy, Inteliquent and Sinch from violating the TCPA in the future.

117.   Plaintiff and Class members are also entitled to an award of attorneys' fees and costs.

**SECOND CAUSE OF ACTION**

**Violations of the 47 C.F.R. § 64.1200(d)(3)**
**Failure to Honor Company-Specific Do-Not-Call Requests**
**(On Behalf of the Company-Specific Do Not-Call Class Against Defendants Sinch, Onvoy and**
**Inteliquent)**

118.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

119.    In violation of 47 C.F.R. § 64.1200(d)(3), Defendants Onvoy, Inteliquent and Sinch continued to make telemarketing calls to Plaintiff and members of the Company-Specific Do-Not-Call Class after Plaintiff Zinger and Class members requested that their numbers be blocked from receiving such calls from Defendants Onvoy, Inteliquent and Sinch.

120.    Plaintiff and members of the Company-Specific Do-Not-Call Class received more than one such call from Defendants in a twelve-month period.

121.    Plaintiff and members of the Company Specific Do-Not-Call Class were damaged by receiving such telemarketing calls in the form of used cell phone minutes, drained phone batteries, invasions of privacy, and emotional distress including anxiety and mental anguish.

122.    Defendants are liable for those violations either directly and through the principles of ratification, as joint venturers, or by knowingly engaging in a conspiracy to make calls to Mr. Zinger and members of the Company-Specific Do-Not-Call Class in violation of the TCPA.

123.    Pursuant to 47 U.S.C. 227(c)(5), Plaintiff Zinger and members of the Company-Specific Do-Not-Call Class are entitled to an award of up to $500 in statutory damages for each call made by Defendants.

124.    Plaintiff and Class members are also entitled to and do seek injunctive relief prohibiting Onvoy, Inteliquent and Sinch from violating the TCPA in the future.

125.    Plaintiff and Class members are also entitled to an award of attorneys' fees and costs.

### THIRD CAUSE OF ACTION

**Statutory Violations of the Telephone Consumer Protection Act, 42 U.S.C § 227(b)**
**ATDS and Prerecorded Messages and Artificial Voices Violations of the TCPA**
**(On Behalf of the Prerecorded or Artificial Voice Robocall Class against Defendants Sinch,**
**Onvoy and Inteliquent)**

126.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

127.    Defendants Onvoy, Inteliquent, and Sinch are, and at all times mentioned herein were each, a "person," as defined by 47 U.S.C. § 153(39).

128.    The telephone number that Defendants Onvoy, Inteliquent and Sinch called to contact Plaintiff and members of the ATDS and Prerecorded or Artificial Voice Robocall Class were assigned to a cellular telephone service, as specified in 47 U.S.C. § 227(b)(1)(A)(iii).

129.    Plaintiff and Class members did not provide their "prior express written consent" allowing Defendants Onvoy, Inteliquent and Sinch to call Plaintiff's and Class members' cellular telephones featuring prerecorded messages or artificial voices or by using autodialers, within the meaning of 47 U.S.C. § 227(b)(1)(A).

130.    Defendants Onvoy, Inteliquent and Sinch used autodialers to make calls to Plaintiff and members of the ATDS and Prerecorded or Artificial Voice Robocall Class featuring prerecorded messages and/or featured artificial voices, like the call artificial voice on the call transcribed in Paragraph 4 of this Complaint.

131.    For example, Defendants send text messages Mr. Zinger the chance to apply for a loan of five thousand dollars after 1:00 am a few days ago.

132.    Defendants Onvoy, Inteliquent and Sinch did not make these telephone calls to Plaintiff and members of the ATDS and Prerecorded or Artificial Voice Robocall Class's cellular telephones "for emergency purposes," as described in 47 U.S.C. § 227(b)(1)(A).

133.     The foregoing acts and omissions by Defendants Onvoy, Inteliquent and Sinch constitute numerous violations of the TCPA's restrictions on making telemarketing calls to consumers that feature prerecorded messages and/or artificial voices using autodialers.

134.     Plaintiff and members of the ATDS and Prerecorded or Artificial Voice Robocall Class were damaged by receiving these telemarketing calls in the form of used cell phone minutes, drained phone batteries, invasions of privacy, and emotional distress including anxiety and mental anguish.

135.     As a result of Onvoy, Inteliquent and Sinch's violations of 47 U.S.C. § 227 *et seq.* Plaintiff and Class members are entitled to an award of statutory damages of $500 for each call that violates the statute.

136.     Plaintiff and Class members are also entitled to and do seek injunctive relief prohibiting Onvoy, Inteliquent and Sinch from violating the TCPA in the future.

**137.**     Plaintiff and Class members are also entitled to an award of attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### Violations of the 47 C.F.R. §§ 64.1200(d)(6)-(8)
### Failing to Follow Call Abandonment Regulations
### (On Behalf of the Abandoned Call Class against Defendants Sinch, Onvoy and Inteliquent)

138.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

139.     Sinch, Inteliquent and Onvoy's use of ATDS devices to call enormous amounts of consumers causes a high rate of abandoned calls. Indeed, the called party may answer the call but the call center where these Defendants transfer consumers is often at capacity and nobody can speak to the consumer. Consumers complaint about having the rush to answer the phone only to find nobody at the other end of the call.

140.     These calls are telemarketing calls made by Sinch, Onvoy and Inteliquent.

141.    These calls are routinely disconnected in three rings or less, but are usually just one ring and go unanswered by the intended recipient.

142.    In violation of 47 C.F.R. § 64.1200(d)(6), Defendants Sinch, Inteliquent and Onvoy disconnected these unanswered telemarketing calls prior to the 4th ring and/or before 15 seconds has elapsed from when the intended recipient's phone began to ring.

143.    Upon information and belief, in violation of 47 C.F.R. § 64.1200(d)(7), Defendants Sinch, Inteliquent and Onvoy failed to connect call recipients to a live sales representative within two seconds of the called person's greeting. Most of Defendants' prerecorded or artificial voice messages are much longer than two seconds.

144.    Upon information and belief, Defendants Onvoy, Inteliquent and Sinch, acting essentially as lead generators, use their technology to dial phone numbers solely to ensure they are voice or fax lines so they can provide their customers with better lead generation services to target with junk faxes or robocalls, depending on the line.

145.    Plaintiff and members of the Abandoned Robocall Class were damaged by receiving these telemarketing calls in the form of used cell phone minutes, drained phone batteries, invasions of privacy, and emotional distress including anxiety and mental anguish.

146.    Pursuant to 47 U.S.C. 227(c)(5), Plaintiff Zinger and members of the Abandoned Robocall Class are entitled to an award of up to $500 in statutory damages for each call made by Defendants.

147.    Plaintiff and Class members are also entitled to and do seek injunctive relief prohibiting Onvoy, Inteliquent and Sinch from violating the TCPA in the future.

148.    Plaintiff and Class members are also entitled to an award of attorneys' fees and costs.

## FIFTH CAUSE OF ACTION

### Knowing and/or Willful Violations of the Telephone Consumer Protection Act, 42 U.S.C § 227 *et seq.*
### (On Behalf of the All Three Classes)

149.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

150.     Defendants Onvoy, Inteliquent and Sinch have been flooded with complaints about the robocalls described throughout this Complaint from consumers alleging violations of the TCPA, both directly and through other entities such as the FCC, FTC and Better Business Bureau.

151.     Defendants Onvoy, Inteliquent and Sinch knew that the calls described throughout this Complaint were made to consumers whose numbers are registered with the national Do-Not-Call registry.

152.     Defendants Onvoy, Inteliquent and Sinch knew that the calls described throughout this Complaint were made to consumers who requested to be placed on each of these Defendants' company-specific do-not-call list.

153.     Defendants Onvoy, Inteliquent and Sinch knew that the calls described throughout this Complaint often featured prerecorded messages and/or artificial voices and were made to consumers that did not provide prior express written consent to receive such calls because they have received an avalanche of complaints from consumers about such calls.

154.     Defendants Onvoy, Inteliquent and Sinch made calls to Plaintiff and members of the all four Classes.

155.     The foregoing acts and omissions of Defendants Onvoy, Inteliquent and Sinch constitute multiple knowing and/or willful violations of the TCPA, including without limitation each of the above-cited provisions of 47 U.S.C. § 227 *et seq*. and its accompanying regulations.

CLASS ACTION COMPLAINT

156.    Plaintiff and members of all four Classes were damaged by receiving these calls in the form of used cell phone minutes, drained phone batteries, invasions of privacy, and emotional distress including anxiety and mental anguish.

157.    As a result of Onvoy, Inteliquent and Sinch's knowing and/or willful violations of the TCPA and its accompanying regulations, Plaintiff and each member of all four Classes are entitled to trebled damages of up to $1,500 for each and every call violating the TCPA.

158.    Plaintiff and Class members are also entitled to and do seek injunctive relief prohibiting Onvoy, Inteliquent and Sinch from violating the TCPA in the future.

159.    Plaintiff and Class members are also entitled to an award of attorneys' fees and costs.

WHEREFORE, Mr. Zinger respectfully requests that the Court grant Plaintiff and members of all three Classes the following relief against all Defendants:

A.    Injunctive relief preventing Defendants Onvoy, Inteliquent and Sinch from violating the TCPA in the future.

B.    As a result of Onvoy, Inteliquent and Sinch's violations of 47 U.S.C. § 227(c), Plaintiff seeks for himself and for each member of the National Do-Not-Call Class statutory damages up to $500 for each and every violation of the TCPA;

C.    As a result of Onvoy, Inteliquent and Sinch's violations of 47 C.F.R. § 64.1200(d)(3), Plaintiff seeks for himself and for each member of the Company-Specific Do-Not-Call Class statutory damages up to $500 for each and every violation of the TCPA;

D.    As a result of Onvoy, Inteliquent and Sinch's violations of 47 U.S.C. § 227(b)(1), Plaintiff seeks for himself and for each member of the National Do-Not-Call Class statutory damages of $500 for each and every violation of the TCPA;

E.    As a result of Onvoy, Inteliquent and Sinch's violations of 47 C.F.R. § 64.1200(d)(6)-(7), Plaintiff seeks for himself and for each member of the Company-Specific Do-Not-Call Class statutory damages up to $500 for each and every violation of the TCPA;

F.      As a result of Onvoy, Inteliquent and Sinch's knowing and/or willful violations of 47 U.S.C. § 227(b)(1), 47 U.S.C. § 227(c), 47 C.F.R. § 64.1200(d)3) and 47 C.F.R. §§ 64.1200(d)(6)-(7), Plaintiff seeks for himself and for each member of all three Classes statutory damages of up to $1,500 for each and every violation of the TCPA;

G.      An order certifying this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, finding that Plaintiff is a proper representative of all three Classes, and appointing Plaintiff's listed counsel as Class Counsel;

H.      An order awarding Plaintiff and members of all three Classes pre- and post-judgment interest, to the extent allowable by law; and

I.      Such other and further relief that this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands trial by jury.

Dated: April 11, 2022

/s/ Alex R. Straus
Alex R. Straus (SBN 321366)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
280 South Beverly Drive
Beverly Hills, CA  90212
Telephone:     (917) 471-1894
Facsimile:      (310) 496-3176
Email:          astraus@milberg.com

Adam Harris Cohen*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
405 East 50th Street
New York, NY 10022
Telephone:     (212) 594-5300
Email:          acohen@milberg.com

*Attorneys for Plaintiff Dmitry Zinger and members of the Classes*

*Pro Hac Vice Forthcoming